[No. 1014.]

THE STATE OF NEVADA, RESPONDENT, *v.* GEORGE W. McLANE, JR., AND FRANK McINTIRE, APPELLANTS.

INDICTMENT FOR MURDER—CHARACTER OF WEAPON USED NEED NOT BE STATED.—An indictment for murder, charging that defendants killed the deceased, "by then and there shooting him," is sufficient, without stating the character of the weapon used in the commission of the offense.

SUFFICIENCY OF EVIDENCE TO SUSTAIN VERDICT.—*Held*, upon a review of the testimony, that the evidence was sufficient to sustain a verdict of murder in the first degree, against both of the defendants.

SEPARATE TRIAL—WHEN MUST BE DEMANDED.—A defendant, jointly indicted with another, who intends to demand a separate trial, must make his motion before the formation of the jury is commenced.

IDEM—GOOD CAUSE MUST BE SHOWN.—Defendant McLane moved for a separate trial, upon an affidavit stating: "That the theory and grounds of defense of the said G. W. McLane, Jr., are entirely incompatible and in conflict with the theory and grounds of defense of McIntire, each with the other:" *Held*, that this affidavit was too indefinite to disclose the real merits of the application; and that the court did not err in denying the motion.

ADMISSIBILITY OF TESTIMONY—STATEMENTS OF DEFENDANTS.—After the death of the deceased, each of the defendants made statements in re-

gard to the homicide, exculpating himself, and imputing the crime to the other. These statements were offered by the prosecution, and admitted by the court, to be considered by the jury as evidence only against the party making them: *Held*, that the respective statements were admissible for that purpose ; that the prejudice resulting to the defendants, from their mutual recriminations, was an unavoidable evil, necessarily incident to their joint trial.

INSTRUCTIONS—SUBSTANCE OF, NEED NOT BE REPEATED.—It is not error for the court to refuse an instruction, asked by the defendant, which is given in substance by the court, in as clear terms and as favorable to the defendant.

IDEM—MUST BE CONSIDERED AS AN ENTIRETY.—The court, in charging the jury, relative to the instructions, said: "No single one is to be considered by itself, but you are to consider them all as one, and reconcile what you find in one with the contents of all of them. Therefore, you will not apply any single one to any single fact, but apply them all in the consideration of every fact:" *Held*, that the jury could not have been misled, by this instruction; into the belief that no single instruction given at defendant's request was perfect in itself.

IDEM—REASONABLE DOUBT.—An instruction, upon the term "reasonable doubt," construed, and held to be correct.

IDEM—CALLING ATTENTION OF JURY TO THE CONFLICTING TESTIMONY OF DEFENDANTS, NOT ERROR.—The court, in referring to the testimony of the defendants, as witnesses in their own behalf, told the jury that they could not believe them both, because they were wholly inconsistent, as to the principal fact in the case: *Held*, that this was not an infringement upon the constitutional prohibition against charging juries as to matters of fact.

OMISSION OF COURT TO INSTRUCT JURY OF ITS OWN MOTION, NOT ERROR. The omission of the court to instruct the jury of its own motion, upon any given point, is not error. Special instructions should be prepared and presented to the court for allowance.

MOTION TO EXAMINE BODY OF DECEASED.—During the trial, the defendant, McIntire, moved the court, upon an affidavit showing the materiality of the testimony, to order an examination of the body of the deceased, and to have the bullets found in his head extracted and produced in court: *Held*, that the court did not err in denying the motion.

OBJECTIONS NOT MADE IN THE COURT BELOW WILL NOT BE CONSIDERED.— An objection, claiming that the court erred in allowing an affidavit for continuance to be read to the jury, not having been made in the district court, will not be considered for the first time on appeal.

RECORD ON APPEAL—AFFIDAVITS NOT PART OF THE RECORD WILL NOT BE CONSIDERED.—Affidavits, suggesting misstatements in the original record, and unfairness on the part of the counsel for the state, copied into the transcript, but not forming a part of the record, will not be considered.

CHANGE OF VENUE—DISCRETION OF COURT.—Defendant, McLane, moved for a change of the place of trial, on the ground of prejudice against him

by the citizens of Lincoln county, to such an extent that he did not believe he could have a fair and impartial trial: *Held,* upon a review of the affidavits, that the court did not abuse its discretion in denying the motion.

CONTINUANCE—ADMISSION BY COUNSEL THAT THE FACTS STATED IN AFFIDAVIT FOR CONTINUANCE ARE TRUE—DEFENDANT NOT BENEFITED BY ADMISSION.—Defendant, McLane, moved for a continuance, on the ground of the absence of one Upshire, a material witness. His affidavit made a clear case in support of the motion. When the affidavit was presented, the attorneys for the state "admitted that if the witness, Upshire, were present, he would testify to the facts set forth in the affidavit, and that such facts are true:" *Held,* upon the peculiar facts of this case, that the defendant, McLane, did not have the full benefit of the admission of counsel that Upshire's testimony was true. (Hawley, J., dissenting.)

APPEAL from the District Court of the Sixth Judicial District, Lincoln County.

The facts appear in the opinion.

*A. B. O'Dougherty and Stone & Hiles,* for Appellant McLane:

I. The court erred in overruling the motion for a change of the place of trial. (1 Comp. L. 1931; *State* v. *Millain,* 3 Nev. 409.) The court can not grant or refuse the application as a mere matter of discretion. (*Freleigh* v. *The State,* 8 Mo. 606; *Clark* v. *The People,* 1 Scam. 117; *Brennan* v. *The People,* 15 Ill. 511; *People* v. *Long Island R. R. Co.,* 4 Park. 602; *People* v. *Sammis,* 10 N. Y. S. C. 560.) Where two or more are jointly indicted, the trial of one may be removed to another court on his application, without removing the trial of the others. (*State* v. *Martin,* 2 Ired. L. 101.) The affidavit of defendant, when strongly sustained, entitles him to have his application granted. (*People* v. *Mahoney,* 18 Cal. 180.)

II. The court erred in denying the motion of the defendant, McLane, for a severance of the trial. (1 Comp. L. 1984; *People* v. *Kohler,* 5 Cal. 72; *People* v. *McCalla,* 8 Id. 301; *People* v. *McIntire,* 1 Parker, 371.)

III. The court erred in denying defendant McLane's application for continuance. (*People* v. *Dodge,* 28 Cal. 445; *People* v. *Diaz,* 6 Id. 249; 1 Arch. Cr. Pr. 533.)

IV. The court erred in denying defendant's motion in arrest of judgment. The indictment is defective. (*People* v. *Hood*, 6 Cal. 236; *People* v. *Lloyd*, 9 Id. 54; *People* v. *Saviers*, 14 Id. 29; *People* v. *Logan*, 1 Nev. 110.)

V. The court erred in refusing to give the instructions asked by defendant.

1. It was error in not giving the instruction, that McIntire's statements were not admissible against McLane, unless made in his presence. (*People* v. *Bonds*, 1 Nev. 33; *State* v. *O'Conner*, 11 Id. 416.)

This instruction presented a correct principle of law, and should have been given. (*People* v. *Williams*, 17 Cal. 142; *People* v. *Ramirez*, 13 Id. 172; *Davis* v. *State*, 10 Ga. 101; Waterman U. S. Dig. 615, sec. 280.)

2. It was error to say that "no single instruction is to be considered by itself." This instruction was ambiguous, and calculated to mislead the jury. (*State* v. *McGinnis*, 5 Nev. 337; *People* v. *Maxwell*, 24 Cal. 14.)

3. The instruction as to reasonable doubt assumed the guilt of the prisoner, and was erroneous. (*People* v. *Duffy*, 6 Nev. 138; *People* v. *Williams*, 17 Cal. 142; *State* v. *McGinnis*, 5 Nev. 337.)

4. The court erred in commenting upon the contradictory statements of the defendants. (Waterman U. S. Dig., sec. 369; *State* v. *Ah Tong*, 7 Nev. 148.)

5. The instruction, that the jury might disbelieve the testimony of either defendant, was erroneous. (*State* v. *Kennedy*, 7 Nev. 374; *State* v. *Ah Tong*, 7 Id. 148; Wat. U. S. Dig., sec. 359.)

VI. It was error to admit the declarations made by the defendant, McIntire, as to the killing of Wallbaum, such declarations, as to other conspirators, were no part of the *res gestæ*. (1 Greenl. Ev., sec. 111; Roscoe Cr. Ev. 417, 418; 2 Archbold Cr. Pr. & Pl. 1845; *Browning* v. *The State*, 30 Miss. 656; *State* v. *Daubert*, 42 Mo. 242.)

VII. The testimony of witnesses as to the declarations of McIntire was inadmissible for any purpose against defendant McLane, and should have been excluded. (*State* v. *Soule*, 14 Nev. 453; *State* v. *Ah Tom*, 8 Id. 214; *Browning* v.

*State*, 30 Miss. 656; *State* v. *Daubert*, 42 Mo. 242; *Clawson* v. *State*, 14 Ohio St. 234; *Strady* v. *State*, 5 Cald. (Tenn.), 300; *Hightower* v. *State*, 22 Tex. 605; *People* v. *Moore*, 45 Cal. 19.)

VIII. When illegal testimony is allowed to go to the jury, the error is not cured by an instruction to the jury to disregard it. (*State* v. *Daubert*, 42 Mo. 242; *State* v. *Wolff*, 15 Id. 168; *D. & M. R. R. Co.* v. *Van Steinburg*, 17 Mich. 99; *Knox* v. *Hunt*, 18 Mo. 174.)

*M. Fuller*, for Appellant McIntire:

I. The demurrer to the indictment should have been sustained. The indictment does not conform to the requirements of the statute. It does not state the character of weapon used in the commission of the offense. (Cr. Pr. Act, secs. 234–236; *People* v. *Logan*, 1 Nev. 110; Arch. Cr. Pr. & Pl. 87; *People* v. *Lloyd*, 9 Cal. 55; *People* v. *Wallace*, 9 Id. 31; *People* v. *Aro*, 6 Id. 208; *People* v. *Hood*, 6 Id. 236; *People* v. *Dolan*, 9 Id. 576.)

II. The court erred in denying the motion of defendant, McIntire, for an autopsy of the body of the deceased. (Whart. Am. Cr. L. 652; 1 Greenl. on Ev., sec. 82, note 1.)

III. The court erred in admitting testimony of witnesses as to the declarations of defendant, McLane, exculpating himself and inculpating the defendant, McIntire. (3 Greenl. on Ev., secs. 94, 110, 111; Whart. Am. Cr. L. 703, 705, 706; Whar. U. S. Dig. 227, p. 610.)

IV. The evidence is insufficient to sustain the verdict against the defendant, McIntire. The judgment as to him should be reversed upon this ground. (*People* v. *Lewis*, 36 Cal. 531; *People* v. *Strong*, 30 Id. 151; *State* v. *Van Winkle*, 6 Nev. 348.)

V. The charge of the court is ambiguous, contradictory and irreconcilable as a whole. In discussing the alleged errors in the indictments, counsel cites: 3 Greenl. on Ev. 43; *People* v. *Ybarra*, 17 Cal. 168; *People* v. *Williams*, 17 Id. 142; *People* v. *Maxwell*, 24 Id. 14; *People* v. *Strong*, 30 Id. 151; *People* v. *Campbell*, 30 Id. 312.

*M. A. Murphy*, Attorney-General, for Respondent:

I. The indictment is sufficient. (*People* v. *Stevenson*, 19 Cal. 275; *People* v. *Dolan*, 9 Id. 583; *People* v. *King*, 27 Id. 509; *People* v. *Judd*, 10 Id. 313; *People* v. *Colt*, 3 Hill, 432.)

II. The court did not err, in refusing defendants a separate trial. Where several persons are jointly indicted for a felony, they can not claim separate trials, as a matter of right, although they sever in their pleas; but the court, in its discretion, may allow them to be tried separately. (*Hawkins* v. *The State*, 9 Ala. 137; *U. S.* v. *Marchant*, 4 Mason, 158; *Commonwealth* v. *Manson*, 2 Ashmead, 31; *State* v. *Wise & Johnson*, 7 Rich. L. R. 412; *State* v. *Conley*, 39 Me. 78.)

A separate trial can not be demanded, as a matter of right, after the jury have been sworn, even if the statute gives the right, when properly claimed. (*Lawrence* v. *State*, 10 Ind. 453; *McJunkins* v. *State*, 10 Id. 140.)

III. Where there is any evidence to support the verdict, it will not be disturbed. (*State* v. *McGinnis*, 6 Nev. 109; *State* v. *Glovery*, 10 Id. 24; *State* v. *Huff*, 11 Id. 17; *State* v. *Raymond*, 11 Id. 99; *State* v. *Crozier*, 12 Id. 300; *State* v. *Mills*, 12 Id. 403.)

IV. Instructions given upon a criminal trial must be read and construed together and taken as a whole. No single sentence is to be selected from the body of any one instruction and held up as being erroneous, while the balance may be good and explain the error away. (*State* v. *Donovan*, 10 Nev. 36; *State* v. *Raymond*, 11 Id. 98.)

V. No error was committed by the court in refusing to give the instruction asked for by the defendant, McIntire, because it had already been given by the court of its own motion, and the giving of the one asked for by McIntire would be likely to mislead the jury. (*People* v. *Varnum*, 53 Cal. 630; *State* v. *Ferguson*, 9 Nev. 106; *People* v. *Bond*, 1 Id. 33; *State* v. *Rover*, 13 Id. 17; *State* v. *Hamilton*, 13 Id. 386.)

VI. The affidavits for a change of venue were insufficient; they merely set forth the opinions of affiants that the defendant, McLane, could not have a fair trial, owing to the

popular prejudice against him.   (*People* v. *McCauley*, 1 Cal. 379; *People* v. *Shuler*, 28 Id. 490; *People* v. *Mahoney*, 18 Id. 180; *People* v. *Congleton*, 44 Id. 93.)

VII. The granting and refusing of separate trials to parties jointly indicted is a matter that is discretionary with the district court, and this court will not disturb the ruling of the lower court without it is made affirmatively to appear that the discretion has been abused.   (Comp. L., sec. 1984; *People* v. *Stockham*, 1 Parker, 424; *U. S.* v. *Gibert*, 2 Sumner, 19; *State* v. *McLendon*, 5 Strob. 85; *Commonwealth* v. *Eastman*, 1 Cush. 189; *State* v. *Conley*, 39 Me. 78; *State* v. *Soper*, 16 Id. 293; *United States* v. *Marchant*, 12 Wheat. 480.)

The defendant, McLane, can not now complain, because his motion was not made in time.   It should have been made before the parties commenced to impanel the jury. A separate trial can not be demanded after the jury has been impaneled.   (*McJunkins* v. *State*, 10 Ind. 140; *Lawrence* v. *State*, 10 Id. 453.)

VIII. The motion for a continuance made upon the affidavit of McLane was properly overruled, after the district attorney had agreed, that if the witness was present, he would testify to the facts as set forth in the affidavit, and that the said facts were true.   (*People* v. *Diaz*, 6 Cal. 249; *State* v. *Brette*, 6 La. An. 652; *People* v. *Vermilyea*, 7 Cow. 369; *Brill* v. *Lord*, 14 Johnson, 341.)

By the Court, BEATTY, C. J.:

The defendants were jointly indicted, tried together, and both found guilty of murder in the first degree.   They unite in appealing from the judgment and from the order denying their motion for a new trial.

Each is nevertheless represented here, as he was throughout the proceedings in the district court, by his own special counsel, and each relies upon one or more assignments of error, based upon exceptions in which the other did not join.   For this reason the case must be treated as if there were two separate appeals, though some points, common to both, will require to be noticed but once.

And, first, as to the indictment. The defendant, McIntire, demurred, and both defendants moved in arrest of judgment, on the ground that it was fatally defective in failing to describe the weapon used in the commission of the alleged offense.

The indictment charges: "That the said George W. McLane, Jr., and Frank McIntire, at the said county of Lincoln, in the said state of Nevada, on the thirteenth day of December, A. D. 1879, or thereabouts, without authority of law, willfully, feloniously, and with malice aforethought, killed Frederick Wallbaum, by then and there shooting him, the said Frederick," etc.

The substantial form to be followed in an indictment for murder is prescribed in section 1859 of the Compiled Laws, and in that form the words "by shooting him" are followed by the words, "with a pistol (or with a gun or other weapon, according to the facts").

Judged by this section alone, this indictment would seem to be defective. But by the very next section (1860), it is expressly enacted that: "It shall not be necessary to set forth in the indictment the character of weapon used, nor that any weapon was used in the commission of the offense, unless the using of such weapon is a necessary ingredient in the commission of the offense."

The meaning and application of this provision is plain. In such offenses as assault with a deadly weapon, drawing and displaying a deadly weapon, etc., the character of the weapon used is an essential ingredient, and in charging such offenses, the necessity of setting this forth in the indictment is readily perceived. But in murder it is not essential that a weapon of any sort should be used, and in such cases the law has wisely dispensed with the necessity of describing a weapon.

The stricter rule, which formerly prevailed with reference to this matter, rested upon two grounds of supposed necessity. It was thought necessary to make the charge in the indictment as specific as possible, in order, first, that a judgment thereon might be an effectual bar to a second prosecution for the same offense; and, second, to afford the

defendant a reasonable guide in the preparation of his defense.

But as the record of a conviction or acquittal, unaided by parol testimony, is not in itself sufficient to sustain a plea of former conviction or acquittal, it is clear that, for this purpose, the difference between charges more or less specific is a difference of degree merely, not of kind, and that the simplification of the charge, although it might, in some rare instance, subject a defendant to greater trouble in sustaining such a plea, does not deprive him of any right guaranteed by the constitution.

As to the second ground, it was long ago discovered that the tendency of the rule requiring the defendant to be informed by the indictment of the exact particulars of the charge against him, was greatly to facilitate the escape of the guilty. without materially contributing to the protection of the innocent; and the courts accordingly proceeded to correct the evil, not by a direct abrogation of the rule, but by resorting to a clumsy expedient by which its effects were neutralized. They sanctioned the practice of charging, in separate counts of the indictment, the use of as many different means of producing death as the pleader might think the uncertainties of his case demanded, thus preserving the rule in form, while abandoning the ground upon which it was supposed to rest; for it is clear that an indictment, which charges the use of every possible means of producing death, is exactly as indefinite as one that charges the killing in the simplest and most general terms.

The present case serves very well to illustrate the foregoing observations. It would have been easy to charge the shooting to have been done with a pistol, in one count of the indictment, with a gun and pistol in another, with two pistols in another, and so *ad infinitum*. But supposing the defendants to have been innocent, how could they have prepared their defense against such a charge, better than against the simple allegation that they killed Wallbaum by shooting him? The difference would have been in this respect a difference of form merely, not of substance, and it can not, therefore, be pretended that the legislature has ex-

ceeded its powers in prescribing the simpler in place of the more cumbrous form.

It is only necessary to say, with respect to the cases cited by counsel for appellants, to prove that this indictment is bad, that they all have reference to the rule of pleading in force prior to the adoption of our statutory rule. (Comp. L. 1860). We think the district court did not err in overruling the demurrer and motions in arrest of judgment.

In order to a proper understanding of most of the remaining points urged in behalf of the appellants, it will be necessary to make a statement of some of the more important facts developed by the testimony adduced at the trial.

It appears that the deceased, Frederick Wallbaum, resided on a ranch in Pahranagat valley. He was unmarried, and had no one living with him except the defendant McIntire, who for some months prior to Wallbaum's death was employed by him as a vaquero. His nearest neighbor was George W. McLane, Sr., father of the other defendant, who resided on a ranch five miles distant.

That Wallbaum was murdered at his ranch on the twelfth or thirteenth of December, 1879, was very clearly proved. On the eighteenth of December his body was fished out of a well on the premises, where it had been thrown and held down by a pile of stones. Death had evidently been produced by two gunshot wounds, one in the back of the head, and the other in the side of the head, and the evidence all tended to show that these wounds were inflicted by one or the other, or both of the defendants, not earlier than the twelfth nor later than the thirteenth of December. McIntire was at Wallbaum's ranch on both the twelfth and thirteenth. McLane was there only on the thirteenth. They left the ranch together early on the fourteenth, going first to the ranch of the elder McLane, and thence to the town of Hiko, where they spent that night. The next day, the fifteenth, they started home, and went as far as Pierson's ranch, which was about a half mile from the elder McLane's. McIntire remained at Pierson's that night, but McLane went home, and, rousing up his father, informed him that McIntire had told him, on their return from Hiko, that

he had murdered Wallbaum. By his father's advice, he started back to Hiko early in the morning, procured a warrant and an officer, and had McIntire arrested. After this he assisted in the search for Wallbaum's body, which, as above stated, was found in the well on his own premises, on the morning of the eighteenth of December. Up to the time he was informed of the finding of the body, McIntire made no countercharge against McLane, although he knew he had been arrested at the instance of the latter. On the contrary, he continued to tell the same story he had been telling since the morning of the thirteenth, when McLane went with him to Wallbaum's ranch—*i. e.*, that Wallbaum was away from home; that he was out in the hills looking after his cattle, and was not expected back for ten days or two weeks. As soon, however, as he was informed of the finding of the body, he made a statement to the effect that McLane, on arriving at Wallbaum's ranch on the thirteenth, had been ordered by the latter not to enter the house; that he pretended to leave, but shortly afterwards slipped up to the door and shot Wallbaum in the back of the head, shooting him a second time in the side of the head, after he had fallen to the floor. He then, McIntire says, compelled him, by threats and intimidation, to assist in carrying the body to the well, and in hurling the stones that were thrown upon it, after which he searched the premises for valuables, and took from among the papers of the deceased a check for one hundred and twenty dollars.

The result of McIntire's statement was, that McLane also was arrested. His statements, made both before and after his arrest, were to the effect that he met McIntire at Pierson's ranch on the afternoon of the twelfth of December, and, being informed by him that Wallbaum was absent from home, agreed to persuade two Indian women to go with him to the ranch the next day; that on the morning of the thirteenth McIntire came to Pierson's ranch with Wallbaum's wagon, and took the squaws home with him in that conveyance, McLane following on horseback, and arriving at the ranch at the same time with the others. He says that, on his arrival, he noticed a number of things that he

knew Wallbaum would not have left behind him if he had really been out in the hills with his cattle, and he also noticed, as a very singular circumstance, that McIntire, instead of drawing water from the well near the house, went to the creek, two hundred yards away. What he observed induced him to suspect that McIntire had murdered Wallbaum and put his body in the well, and this suspicion was confirmed by McIntire's explicit statement to that effect, made on their way back from Hiko. Each of these statements was consistent enough of itself and with most of the surrounding circumstances, but each was contradicted, in important particulars, by the testimony for the state.

McIntire was contradicted by proof that he had said over and over again, and to a number of different persons, between the twelfth and eighteenth of December, that Wallbaum was away from home, and that he persisted in telling this story after he knew McLane had accused him of the murder and when he was in no possible danger of violence from McLane. His pretense that he was afraid of McLane is also contradicted by the whole tenor of his conduct during the fourteenth, fifteenth and sixteenth of December, and by the fact that he voluntarily returned with him to the vicinity of his father's ranch, instead of denouncing him to the authorities at Hiko, and putting himself under their protection.

The check, also, for one hundred and twenty dollars, indorsed by the payee, and identified as the property of Wallbaum, which, he says, was taken from among the papers of the deceased by McLane, appears to have been in his own possession before the time when he says McLane delivered it to him. He pretends that he received it from McLane at the time the latter was starting to have him arrested, on the morning of the sixteenth, but it was shown that as early as the fourteenth, when he was drinking at Hiko, he was boasting of the amount of his funds, and threw a paper on the counter, which he said was a check, and which he put back in his pocket in consequence of something said to him by McLane in a language not understood by those present. If he had a check at that time, it

must have been the check for one hundred and twenty dollars, for he had none other.

McLane's story was less improbable in itself and less seriously in conflict with surrounding circumstances than McIntire's, but two witnesses testified to a fact fatally inconsistent with his theory that Wallbaum had been murdered, thrown into the well and covered with stones before he arrived at the ranch. They testified that when they arrived at Wallbaum's ranch, on the seventeenth of December, their attention was called by McLane to the tracks of a wagon going from the front of the house to a heap of stones, from which the top had recently been removed, and thence to the brink of the well. They were searching for the body, and McLane expressed his belief, founded on the condition of the stone heap and the position of the wagon tracks, among other things, that the body was in the well and had been covered with stones.

This surmise, if surmise it was, proved to be correct; but the witnesses to whom the tracks were pointed out, swore that they followed them up from the brink of the well, where the wagon was then standing, and found the wheels of the wagon resting in the identical tracks they had made in coming from the well. They and others also testified that the condition of the dirt and fragments of rock in the bottom of the wagon showed that it had never been used after the stones were hauled. If this testimony was true—and of that the jury was to judge—it proves that this wagon, which was the same one in which the squaws were brought to the ranch on the morning of the thirteenth, had been used after that time for hauling the stones—that is to say, that it was so used after the arrival of McLane at the ranch; for he arrived there with the squaws, according to his own statement. It was shown, moreover, that McLane did at one time have the check for one hundred and twenty dollars in his possession, and when it was taken from McIntire, after his arrest, it was found inclosed in a letter envelope in which McLane had received a letter through the mails, and bearing his address. He accounts for these facts by saying that McIntire had requested him to take care of his

papers while he was drinking at Hiko, as he had no pocket-book and was afraid of losing them. He did not, however, offer any explanation of his supposed admission to McIntire to put the check in his pocket at the time he first displayed it in Hiko.

But the important evidence against McLane was that in regard to the wagon tracks on the seventeenth of December. The testimony on the latter point was, it is true, not very positive, but as to the tracks, two witnesses swore positively that, on the seventeenth of December, the wheels of the wagon still rested in the identical tracks they had made in coming from the well. The force of this testimony can only be obviated by arguing that the witnesses were mistaken; that their failure to call the attention of the other persons present to what they say they observed, proves that they attached but slight importance to it at the time, and consequently, that they could not have made their observations with the amount of care they would otherwise have bestowed on a circumstance so important. As an argument to the jury, this was entitled to serious consideration, but it can have no influence here. We have no jurisdiction to decide upon the credibility of witnesses. If their evidence, taken as true, warrants the verdict, it is conclusive in this court in favor of the correctness of the finding.

We can not say, in this case, in view of the facts above stated, and the numerous minor details from which they gain color and consistency, that the verdict against either defendant was unwarranted by the evidence.

The next point to be noticed, is the alleged error of the court in refusing to allow the defendants separate trials.

Our statute provides (Comp. L. 1984) that: "When two or more defendants are jointly indicted for the same offense, they shall be jointly tried, unless for good cause shown by the prosecution or defense, the court shall otherwise direct."

This section does not by itself materially change the common law rule (1 Bishop Cr. Pr., sec. 1018). But by another section (1944) it is provided that: "When several

persons, jointly indicted, are tried together, they are not allowed to sever their challenges, but must join therein."

A similar provision in the law of California was held to apply to peremptory challenges (*People* v. *McCalla*, 8 Cal. 301), and it follows that no such challenge can be insisted on, as matter of right, unless all the defendants on trial unite in making it. This is an essential change of the old rule, which, in such cases, secured to each defendant his full number of challenges (1 Bishop Cr. Pr., sec. 1028), and it may be that one result of this change is greatly to abridge, if not entirely to take away, the discretion of the district court to refuse separate trials where it is made to appear, at the proper time, and in the proper way, that the defendants, on account of the antagonism of their position, can not join in their peremptory challenges.

That the defendants in this case each relied for his exculpation upon establishing the guilt of his co-defendant is plainly apparent from the statement of facts above given, and if either had moved for a separate trial at the proper stage of the proceedings, and upon a sufficient showing of facts, we should have been strongly inclined to the opinion that the denial of his application would have been error.

But the defendant, McIntire, never, at any stage of the proceedings, asked for a separate trial, and we know of no authority for holding that it was the duty of the court, of its own motion, to order separate trials. The time to determine whether defendants jointly indicted are to be tried separately or together, is before the formation of the jury is commenced, and at the time the court knows nothing of the line of defense the defendants expect to take, or of any other facts constituting good cause for ordinary separate trials. The statute is plain, to the effect that separate trials are not to be ordered, unless good cause therefor is shown either by the prosecution or defense, and this implies that the party desiring a separate trial must apply for it and support his application by a sufficient showing of facts. Even where the right to a separate trial is absolute if demanded, it may be waived by a failure to demand it before

commencing the selection of the jury.   (*People* v. *McCalla,* *supra.*)

It would appear from the record of this case, that McIntire elected to be tried together with his co-defendant, and as to him, therefore, it is clear that the action of the court in this respect was not erroneous.   The case of McLane is different.   His counsel, before the formation of the jury was commenced, read an affidavit, upon which he announced he would, at the proper stage of the proceedings, move for a separate trial.   His impression was that the proper time for moving was after the completion of the jury.   He discovered his error in time, however, to make his motion before the jury was sworn or completed.   Even this, we think, was too late to be regular.   A defendant who intends to demand a separate trial, especially in a case like this, ought not to embarrass his co-defendant and delay the court by taking part in the impaneling of a jury by which he does not intend to be tried.   But it is not upon this ground that we rest our conclusion that the district court did not err in denying the motion.   The statute requires the motion to be sustained by good cause shown, and, we think, the affidavit in support of McLane's motion was scarcely sufficient.   It merely states, in general terms, "that the theory and grounds of defense of the said G. W. McLane, Jr., are entirely incompatible and in conflict with the theory and grounds of defense of McIntire, each with the other.   Wherefore," etc.

This was too indefinite to disclose the real merits of the application.   It should have been explicit to the effect that each defendant had accused the other of the murder, and that, under the circumstances, neither could be acquitted, except upon the hypothesis that the other was solely guilty.   Nothing like this could be inferred from the terms of the affidavit, and in the absence of a sufficient statement of the facts, we do not think the court erred in denying the motion.

The next assignment of error relates to the rulings of the court touching the admissibility of testimony.   The ex-

ceptions to these rulings were very numerous, but they involve only one question.

After Wallbaum's death, each of the defendants made more than one statement in regard to the homicide, exculpating himself and imputing the crime to the other.   On the trial, these statements were proved by the prosecution. When evidence of McLane's statements was offered, McIntire objected to it, on the ground that it was incompetent as to him, and when his own statements were called out, McLane made a similar objection.   Undoubtedly these statements were incompetent, except as against the parties by whom they were respectively made, and if they had been offered and admitted generally as against both defendants it would have been a most glaring error.   But in fact they were not so admitted.   It is true, that when the first offer was made to introduce evidence of one of these statements, the court inquired whether the prosecution expected to prove a conspiracy, and on receiving an affirmative answer, admitted the testimony, apparently upon the theory that, upon proof of a conspiracy to commit the murder, the declarations of each defendant, though made after the accomplishment of the joint purpose, would be evidence against both. But almost immediately the court perceived the error of this view, and from that moment to the end of the trial it was declared over and over again by counsel and the court that the statements of the defendants were not received, and were not to be considered as evidence, except as against the party making them.

That they were admissible to that extent, and under the limitations declared by the court, there can be no doubt. The fact that each defendant charged the crime upon the other makes no difference as to the admissibility of his statements as evidence against himself.   Of course, if it were true, as claimed by counsel for appellants, that their respective statements contained no evidence against themselves, there would be good ground for charging misconduct upon the prosecution and error on the part of the court, in offering and admitting them to the consideration of the jury.   But such was far from being the case.   Every

statement made by either defendant showed that he was aware of many circumstances connected with the homicide, and proof of such knowledge had a tendency at least to prove participation; it made out part of the state's case, which was completed to the satisfaction of the jury, by showing that the conduct of the defendants was inconsistent with that part of their respective statements exonerating themselves.

If they had been tried separately, no one would venture to deny that McIntire's statements could have been proved against him, and McLane's against him; and it is equally undeniable that the statements of each showed too intimate a knowledge of the circumstances of Wallbaum's murder, and the disposition of his body, not to require a consistent and truthful explanation, in order to rebut a reasonable presumption of guilty participation therein. That the testimony was admissible there can be no doubt, and the prejudice resulting to the defendants from their mutual recriminations, if any such did in fact result, was an unavoidable evil necessarily incident to their joint trial. In such trials, evidence of this character must often be admitted, and the best the court can do, to prevent prejudice, is to declare at the time, and afterwards instruct the jury, under what limitations it must be applied. (*Commonwealth* v. *Ingraham,* 7 Gray, 46.)

There is nothing in any of the cases cited by appellants inconsistent with this view. All that was decided in *State* v. *Ah Tom,* 8 Nev. 214, and in *State* v. *Soule,* 14 Id., was, that the statements of one defendant, not being competent evidence against a co-defendant, it was error to admit them against the defendants generally and without limitation.

In this case there is no such ground of complaint. The purpose for which the testimony in question was offered, and the extent to which it could be considered, were plainly and repeatedly declared to the jury. The court, therefore, did not err in admitting it.

The next series of assignments of error relates to the charge of the court, and the instructions asked by the defendants, and refused by the court.

The defendant, McIntire, asked the following: "The jury are instructed that, in your deliberations upon the testimony given in the trial of this case, you are not to take into consideration at all, in passing upon Frank McIntire's case, any testimony given before you as statements of third parties made to the witnesses on the stand that was not made in the presence of the said Frank McIntire."

An instruction worded somewhat differently, but in substance the same as the above, was requested by the defendant, McLane.

Both instructions were refused, for the reason, among others, that the court has already charged the jury of its own motion as follows: "The jury is instructed that in determining the guilt or innocence of the defendant, McIntire, you will not consider, either for or against him, any testimony which has been given by any of the witnesses of the statements made by the defendant, McLane, to such witnesses of what McIntire told him, McLane.

"In this connection you are also instructed, that in determining the guilt or innocence of the defendant, McLane, you will not consider either for or against him, any testimony which has been given by any of the witnesses, of statements made by the defendant, McIntire, to such witnesses.

"No man should be convicted of any offense except upon sworn testimony. Testimony as to circumstances such as the condition of the wagon-body, the point of entrance and of exit of bullets, the course of the wagon tracks, etc., becomes, when sworn to, as in this case, what is called '*sworn testimony*,' but the '*statements*' made by McLane anywhere but in this trial, of what McIntire told him (McLane), were matters related as in ordinary conversation, or, if under oath, as was the case before the coroner, McIntire was not present and had no opportunity to cross-examine him, and therefore they amounted to no more than conversations, and are in no sense testimony, which you can consider against McIntire. This same rule applies in favor of McLane, who can not be found guilty by you upon the strength of any '*statements*' made by McIntire to Dodge,

Heath, Moore, or others, as these statements of his were made in McLane's absence, and while McIntire was not under oath.

"You will bear in mind that the counsel for the common-wealth when these various statements were admitted in evidence, disclaimed that they were intended to operate against any but the defendant who may have made them to the witnesses who have reported them here, and the only purpose for which you can consider them is to determine whether such '*statements*' are consistent with the *facts* which you may find have been established to your satisfaction. For instance, if you find that McLane told a witness that McIntire had admitted certain things to him (McLane), you can consider such statement as having been made by McLane, and can determine whether such statement is consistent with McLane's conduct. The same rule as to the 'statements' which you may find that McIntire made of what McLane *did*. You are to weigh such statements and see if they are consistent with what you believe to have been, not McLane's conduct, but altogether with respect to the consistency of McIntire's."

These instructions given by the court of its own motion covered the whole ground of those which were asked by the defendants; they were as clear and favorable and much fuller, and therefore the court did not err in refusing to repeat them. (*State* v. *O'Connor*, 11 Nev. 425.)

In the charge of the court to the jury the following language occurs: "No single one (of the instructions) is to be considered by itself, but you are to consider them *all* as one, and reconcile what you find in one with the contents of all of them. Therefore, you will not apply any single one to any single fact, but apply them all in consideration of every fact."

The appellants complain that this language implies that, in the opinion of the court, no single instruction given at their request was perfect in itself, and that it must have had the effect of depriving them of the benefit of specific instructions applicable to particular facts.

We do not think the jury can have been misled by this

part of the charge of the court. It does not, in our opinion, necessarily imply that none of the special instructions was perfect in itself, but merely conveys to the jury a salutary caution not to give an unlimited application to any instruction until they have first compared it with other portions of the charge, to see how far, if at all, it may be qualified thereby.

The court, at the request of the parties, gave several instructions on the subject of reasonable doubt, and thereupon added the following:

"The wisdom and charity of the law provides, that if a jury entertain a '*reasonable doubt*' of a defendant's guilt, such defendant is entitled to be acquitted. In this case, much has been said about this thing called 'reasonable doubt,' and I have, at the request of the counsel, given you several instructions wherein I use the words '*reasonable doubt.*' The meaning of that term, as I have used it, and wherever it occurs, either in these instructions, or in the law books, *is not* that if the jury entertain a mere *possible* doubt they should acquit. There is no fact depending upon testimony, but that a *possible* doubt may arise or suggest itself to the mind concerning it, and it is not upon doubts of this *possible* character that the law says a defendant shall be acquitted. Further, in explanation of this term, '*reasonable doubt,*' I charge you to dismiss any prejudice or feelings you may entertain, carefully weigh and compare and consider all the testimony in this case, and if, after such comparison and consideration, you verily believe that what you consider as the *facts* all point to the guilt of the defendants, or either of them, and further, that such facts are inconsistent with any other reasonable conclusion than such guilt, and at the same time from such facts you feel an abiding conviction of such guilt, then there can not be said to be any such 'reasonable doubt' in your minds as is meant by the use of that term in these instructions, nor such as will entitle a defendant to an acquittal."

We see no error in this instruction. It may contain some expressions which, separated from the context, are open to criticism; but, taken as a whole, it gives a correct statement

of the meaning of "reasonable doubt"—as correct and definite, that is, as the subject admits.

Counsel contend that the expression used by the court, "this thing called reasonable doubt," must have been understood by the jury as a contemptuous or disparaging reference to the doctrine contained in their instructions, but we do not think it could have been so understood. Neither do we see that any sinister meaning was imparted to any portion of the charge by the underscoring of words. We have copied the instructions literally, underscoring and all, and it appears to us that the words underscored are such as would naturally have been emphasized in reading them to the jury.

If, as counsel contend, the court erred in instructing the jury, that one or both of the defendants might be found guilty of manslaughter, it is a matter of no consequence. The error, if error there was, was in favor of the defendants, and the verdict shows conclusively that the jury found no occasion to apply the doctrine of the instructions complained of.

In referring to the testimony of the defendants, as witnesses in their own behalf, the court told the jury that they could not believe them both, because they were wholly inconsistent as to the principal fact in the case.

This was no transgression of the statutory and constitutional prohibition against charging juries as to matters of fact. Courts may state the testimony, as well as declare the law, to juries. (Const., art. VI., sec. 12.)

In this case the defendants did contradict each other as to the principal fact in issue, and the court had a right to state that contradiction to the jury. That two conflicting accounts of the same transaction can not both be believed at the same time, by the same persons, is not a fact peculiar to this case or any case, but is a principle of logic universally applicable, and certainly the statement of it must always be harmless and it would seem superfluous.

There are, in addition to those we have discussed, a number of less important exceptions to the charge of the court, which need not be noticed in detail. They involve a very

extended and minute criticism of various passages, which counsel suppose may have been understood in a sense injurious to the appellants. We think, however, that although the charge may contain expressions here and there which are liable to criticism, it is free from anything like positive and material error; and, on the whole, is a fair and correct statement of the law applicable to the questions to be determined. We have copied those portions which are most complained of, and, without further discussion, leave them to speak for themselves.

As to the omission of the court to charge, of its own motion, upon certain points (the law touching accessaries after the fact, for instance), we have only to repeat what we have frequently said heretofore, that such omissions are not error. And they can always be supplied—as in this case they actually were—by preparing special instructions and presenting them to the court for allowance.

The foregoing are all the points common to both appeals, but each of the appellants has one or two assignments of error peculiar to his own case.

It appeared from the testimony of the first witness examined on the part of the state, that Wallbaum's death was caused by two gunshot wounds, one in the back of the head, the other in the side of the head; that the first was smaller than the second; that the bullet entering at the back of the head had passed out at the mouth, and that the other remained in the head and was never extracted. At a later stage of the trial, it was shown that at the time of the homicide the defendants had pistols of different caliber; that of McIntire being the larger of the two. It would seem that it was part of the theory of the state that the wound in the back of the head was caused by a bullet out of McLane's pistol, and the other by a bullet from the larger pistol belonging to McIntire. At any rate, whether this was a part of the theory of the prosecution or not, counsel for McIntire seems to have anticipated that it would be, and he caused McIntire to make an affidavit, stating his belief that the production of the bullet, still remaining in the brain of the deceased at the time he was

buried, would show that both wounds were made by bullets of the same size, and would greatly tend to acquit him of the charge laid in the indictment. He thereupon moved the court to order an examination of the body of the deceased, which motion the court overruled.

There is no doubt that the size of that bullet was a material fact. If it had been extracted and had proved to correspond to the caliber of McLane's pistol, it might have been argued with great force in behalf of McIntire that the smaller wound in the back of the head could not have been made with his pistol, which was larger than McLane's; and his statement that McLane alone did the shooting would thus have received material support.

But it does not follow from the fact that the testimony was material, that the court erred in overruling the motion. We know of no law that empowers the district court to order any person to make the kind of examination suggested. There is no person subject to the orders of the district court for any such purpose. Undoubtedly the court might have granted a continuance or adjourned the proceedings to enable the defendant to procure the examination of the body of the deceased, if a proper application supported by a sufficient showing of facts had been made. But the motion was not for a continuance or adjournment, and even if it could be so regarded the affidavit was insufficient to support it. A motion of that character, coming in the midst of a trial, ought to be very strongly supported, by a showing that the evidence was then for the first time discovered, or that it was rendered material by some unexpected turn of the proceedings that could not reasonably have been anticipated. The affidavits should also show the necessity of the adjournment or continuance, and the ability of the party to procure the evidence in case his motion was allowed. On all these points the affidavit filed in support of this motion was silent, and therefore, if it were treated as a motion for a continuance or adjournment, it could not be said that the court erred in overruling it.

But, as above stated, the motion was of a different charac-

ter; it was simply an application to the court to make an order that some person should dig up the body of the deceased, extract the bullet, and produce it in court. It was a sufficient reason for denying this application that the court had no power to comply with it.

With reference to the principal argument, by which counsel supports this assignment of error, viz., that the size of the bullet was the best evidence of the size of the pistol by which the wound was produced, and therefore, that it was the duty of the court to order an autopsy—it need only be said that the rule which requires the production of the best evidence, merely enables a court to exclude secondary evidence of a fact, and thus indirectly to compel a party to produce the best. The party who wishes to avail himself of the rule, must, therefore, object to the secondary evidence when it is offered, otherwise he loses its benefits. In this case, however, there was no room for such an objection. The size of the pistol or pistols with which Wallbaum was shot was not an essential part of the case against McIntire, and even if it had been, the size and appearance of the wounds, though less conclusive and satisfactory than the production of the bullet which remained in the head, was still primary evidence of the fact to be proved, differing in degree, but not in kind, from the bullet itself. We have no means of knowing to what extent, if any, the prosecution relied upon the testimony, as to the character of the wounds, to prove that one of them was caused by a bullet from McIntire's pistol, but in so far as that was a part of the theory of the state, he had the undoubted right to claim the strongest inference in his favor from the failure of the state to produce the bullet, and under the instructions of the court the jury must have allowed him the benefit of every doubt arising out of such failure.

But the truth is, the case against McIntire rested to a very slight extent upon the character of the wounds upon the body of the deceased. What convicted him was the proof that for days after he pretends to have seen McLane murder his employer and appropriate his valuables, he con-

tinued voluntarily to associate with him on the most intimate and confidential terms; that he was found in possession of the only thing of value taken from the person of the murdered man; that he continued to deny the fact of the killing even after his arrest at the instance of McLane, and persisted in such denial until informed of the discovery of the dead body; that he then told a story evincing a perfect knowledge of the details of the crime and the efforts made to conceal it; that he endeavored to account for his conduct at and subsequent to the killing, by the false pretense that he was afraid of McLane, and that he gave a false account of the time when and the manner in which he got possession of the check—the fruits of the crime. In view of these circumstances, the most positive proof that the shooting was done by McLane alone would scarcely have invalidated the case against McIntire.

The only remaining point in McIntire's appeal arises as follows: When the case was called for trial, McLane moved for a continuance on the ground that one Upshire would, if present, testify to certain facts. The state, to prevent a continuance, admitted that the facts were as stated in McLane's affidavit, and thereupon the trial proceeded.

The facts stated in McLane's affidavit were in corroboration of his statement and the contradiction of McIntire's statement as to the occurrences at Wallbaum's ranch on the thirteenth of December, in the afternoon, and subsequent to the murder of Wallbaum.

The bill of exceptions shows that, in the course of the trial, McLane's affidavit was read to the jury; but it does not show that McIntire objected, that the court made any ruling, or that any exception was taken. Neither does it show that it was ever stated to the jury that the facts set out in the affidavit were admitted by the state to be true.

Under these circumstances—no objection having been made in the district court to the reading of the affidavit—it is unnecessary to consider what would have been the result if the court had overruled an objection interposed at the proper time. It is clear that the objection can not be raised here in the first instance.

With respect to certain affidavits copied into the transcript, but not forming a part of the record, it need scarcely be said that they can not be considered. We allude to the affidavits suggesting misstatements in the original record remaining in the district court, and unfairness on the part of the counsel for the state, in his closing argument to the jury.

Our conclusion upon this review of all the points urged in behalf of the defendant, McIntire, is that the record discloses no error injurious to him, and that as to him the judgment of the district court must be affirmed.

We come, finally, to the separate assignments of error made by McLane.

He complains that the court erred in denying his motion for a change of the place of trial. The motion was supported by affidavits of his counsel, his father and himself. His counsel testified that he was personally acquainted with a majority, and had conversed with a large number, of the citizens of Lincoln county; that he believed from those conversations that there was an almost universal prejudice against the defendant; that he had heard the opinion almost universally expressed, that defendant ought to be hanged, even without process of law, and in one instance had heard the opinion expressed, that if he should be acquitted he would never leave the town of Pioche alive; that the feeling against the defendant had been excited and kept alive by highly injurious and prejudicial accounts of the offense with which he was charged, published in the Pioche Record, the only paper published in the county; that for these reasons he thought any jury impaneled in the case must inevitably be overawed by the state of feeling prevailing in the county, and that a fair and impartial trial could not be had.

Defendant and his father testified to their belief in the existence of the same state of feeling in the county, and to the fact that they feared at one time that he would fall a victim to popular violence on his way from his place of commitment to the county jail.

Upon this showing we can not say that there was any

abuse of discretion on the part of the court in denying the motion. The affidavits contain little beyond the expression of opinion. That of counsel for defendant states more facts than either of the others; but the facts, as stated, are not very convincing. He states that he has had numerous conversations, but does not state how numerous they were, either absolutely or relatively to the population of the county, and the injurious accounts of the offense which he alleges were published in the local paper, are not set out, and the court had no means of judging whether they were of such character or frequency as to excite undue prejudice. There seems to have been no difficulty and there was very slight delay experienced in obtaining a jury free from exception.

On the whole, we think the application in this case for a change of venue, was not materially stronger than that in the *Case of Millain,* 3 Nev. 433, where the order overruling the motion was affirmed by this court. It is not shown in this case, any more than in that, that the parties threatening violence to the defendant were either numerous or influential; and we do not understand that the mere prevalence of a belief in the guilt of a prisoner, however widely diffused, is a circumstance from which it must be inferred that a jury would be intimidated or overawed.

His motion for a change of the place of trial being overruled, McLane next moved for a continuance to enable him to procure the attendance of one Upshire, as a witness in his behalf. It is conceded that his affidavit made a clear case in support of the motion. But the district attorney, to obviate a continuance, offered to admit the truth of all that it was claimed the witness would testify to if present at the trial, and thereupon the court overruled the motion.

It is settled law in this state, that nothing short of an unqualified admission of the truth of the proposed testimony will justify the refusal of a continuance where, as in this case, the affidavits fully support the motion. (*State* v. *Salge,* 2 Nev. 325.) The doctrine seems to be that the defendant has an absolute right to the attendance of the witness, or an unqualified admission of the truth of every material fact to which he will testify. The admission must

be such as to place the facts beyond controversy, and not only to authorize but to require the jury to treat them as incontrovertibly true in all their deliberations.

The question is, whether McLane had the benefit of such an admission in this case. So far as it lay within the power of the state to do so, the admission was clearly made; but it is a peculiarity of this case that the issue was not exclusively between the state and the defendants. Each defendant was, in a certain sense, prosecuting the other, and the circumstances against McIntire were such that he had no chance of an acquittal, unless he could induce the jury to believe his statement to the effect that McLane alone had committed the murder on December 13, and had then compelled him, by threats and force, to assist in concealing the crime.

It happened that Upshire came to Wallbaum's ranch on the afternoon of December 13, and remained there till next morning. McIntire had stated before the trial, and on the trial testified that McLane, after killing Wallbaum, took upon himself the entire control of the ranch, domineering over everybody, ordering and directing everything; and that, when Upshire arrived and asked permission to stay all night, McLane gave the permission, issued directions for his entertainment, and next morning received payment therefor. What McLane proposed to prove by Upshire was, that all this was the exact reverse of the truth; and it is evident that if he could have done so to the satisfaction of the jury it would have completely broken down McIntire's testimony, which, to whatever exent it was credited, tended much more strongly to convict McLane than any other testimony in the case. It is also clear, as an independent proposition, without reference to the statements and testimony of McIntire, that it was very important for McLane to show what he was doing at Wallbaum's during the afternoon of December 13, and what his apparent relations to McIntire were at the time. To do this, he was entitled to the presence of Upshire, or to such an admission as would put the facts proposed to be proved by him, beyond all controversy before that jury. No such admission was or could,

under the circumstances of this case, be made by the state. The state could not admit away McIntire's defense, nor could he be deprived of the privilege of testifying in his own behalf, and thus putting in controversy all that the state proposed to admit. As a matter of fact, he did so testify, and did contradict everything alleged in McLane's affidavit. His testimony was submitted to the jury, and they were instructed, in effect, to weigh and consider it fairly and impartially, and give him the benefit of it, so far as it appeared to be credible. Under these circumstances, it appears to us that McLane could not have had any benefit from the state's admission. The jury could not have given full credit to the admission, and at the same time have weighed and considered the testimony by which it was flatly contradicted; and they could not have avoided considering the contradictory testimony without disregarding the instructions of the court and the undoubted rights of the defendant, McIntire.

The case was unfortunately in such a position that error injurious to one or the other of the defendants was inevitable. If the court had refused to instruct the jury to consider McIntire's testimony, it would have been error injurious to him, and the giving of the instruction just as clearly had the effect of destroying the state's admission in favor of McLane. If McLane had demanded an instruction to the jury that they were to accept as incontrovertibly true the fact set out in his affidavit, it could not have been refused without error as to him, nor given without error as to McIntire. No such instruction having been asked or allowed, McIntire has no ground of complaint, but it was error as to McLane to submit to the consideration of the jury testimony in direct negation of facts which he was entitled to have treated as incontestable.

It is, therefore, ordered that the judgment of the district court as to the defendant, George W. McLane, Jr., be reversed, and the cause remanded for a new trial, and that the judgment as to Frank McIntire be affirmed, with directions to the district court to appoint a time for carrying its sentence into execution.

HAWLEY, J., dissenting:

In my opinion, the court did not err in overruling the motion of the defendant, McLane, for a continuance. The facts which he expected to prove by the witness Upshire, as set forth in his affidavit, are as follows: "That he will prove by said witness that on Saturday, the thirteenth day of December, A. D. 1879, the day on which the defendant, McIntire, alleges in his statement that the alleged murder of Fred. Wallbaum was committed, on the afternoon of that day, a stranger, whose name affiant has learned is Joseph Upshire, came up to Wallbaum's house and asked to stay all night; that Frank McIntire replied 'he did not know that he could,' as the owner of the place was out with stock at Cain Springs; that he, said Upshire, replied 'he had no grub with him, and if he could stay he would pay whatever the bill was;' that he thereupon unsaddled his horse and stayed all night, Frank McIntire having told two squaws, who were at the place, to prepare his supper; that the said Upshire will further prove that on the said night of December 13 he saw the said McIntire take two rosettes from Wallbaum's blind-bridle and put them on a riding bridle which McIntire claimed to be his own; that the said Upshire left Wallbaum's shortly after sunrise, but before starting he asked McIntire what his bill was; that McIntire replied that it was two dollars; that Upshire then gave McIntire five dollars in gold, and McIntire returned him three dollars in silver in change; that McIntire then told Upshire he would probably see Wallbaum at Coyote Springs, Upshire having intimated that he was traveling in that direction; that the said Upshire will prove that all this conversation and all the arrangements about stopping all night, and about the supper and the payment of the two dollars for said supper, and the handing the five dollars to McIntire, and the return of the three dollars in change, took place between McIntire and said Joseph Upshire, and that affiant had no act, part, or participation in said conversation, or anything that related to the aforesaid acts that occurred between the said Upshire and McIntire, and that the entire

statements of McIntire in relation to what he states as having occurred between the said Upshire and this affiant is entirely untrue and without the slightest foundation in fact."

The record shows that, when this affidavit was presented, the attorneys for the state "admitted that if the witness Upshire were present he would testify to the facts set forth in the affidavit, *and that such facts are true.*"

With this admission, it is apparent that the defendant, McLane, had the full benefit of all the facts set forth in his affidavit. In considering his case the jury, were bound (notwithstanding the testimony of the defendant, McIntire, in his own behalf to the contrary) to accept the testimony that Upshire would have given, if present, as absolutely true. What more could the defendant, McLane, ask? It is easy to see that a qualified admission, that if a witness were present he would swear to certain facts, is not calculated to have the same force and effect as if a credible and respectable witness were present in court swearing to the same state of facts. · (See *State* v. *Salge*, 2 Nev. 325; *People* v. *Diaz*, 6 Cal. 249; *State* v. *Brette*, 6 La. An. 653; *People* v. *Vermilyea*, 7 Cow. 369.)

But it is difficult, if not impossible, to determine how a defendant could be prejudiced in a case where the admission is absolute and unequivocal that the testimony which the absent witness would give *is true.* In the latter case the defendant could read his affidavit as evidence — as the defendant, McLane, did in the present case—and the state would be precluded from offering any testimony tending to affect the credit or to contradict or impeach the testimony of the absent witness. (*Willis* v. *The People*, 1 Scam. 402; *Dominges* v. *The State*, 7 S. & M. 478; *Browning* v. *The State*, 33 Miss. 71.)

"Under the admission," to quote the language of the · court in the case last cited, "the prisoner was entitled to treat the facts stated in his affidavit as absolutely true, according to their force and effect, as stated, and supposing that he stated the facts not more nor less strongly than the truth, it is not to be presumed that he was prejudiced by their admission." (See also, *Pannell* v. *State*, 29 Ga. 681;

*State* v. *Mooney*, 10 Iowa, 506; *Carmon* v. *State*, 18 Ind. 451.)

The fact that the issue in this state "was not exclusively between the state and the defendant;" that "each defendant was prosecting the other," did not deprive the defendant, McLane, of the benefit of the unqualified admission made by the state.

If the witness Upshire had been present at the trial, his testimony would, as McLane claimed, have contradicted the testimony of the defendant, McIntire, and it would then have been the province of the jury to decide whether the witness Upshire, or the defendant, McIntire, had sworn falsely. The defendant, McLane, could only have asked, in that case, that the jury should believe the testimony of Upshire to be true. The admission was certainly as favorable to the defendant as if the witness had been personally present. It was more favorable. It deprived the attorneys for the state from arguing against the credibility of the witness Upshire, or the truth of his testimony, as they might have done if the witness had been present. It is begging the real question at issue to say that, under the peculiar circumstances of this case, "the state could not admit away McIntire's defense," nor deprive him "of the privilege of testifying in his own behalf."

Of course the state could not, as against the objection of the defendant, McIntire, admit that Upshire's testimony was absolutely true; for, as before stated, that would prove that McIntire's statement, relative to the facts that Upshire would testify to, was false.

The defendant, McIntire, had the unquestioned legal right to have that question submitted to the jury. But in this connection it must be remembered that it is one of the peculiar circumstances of this case that he made no objection to the admission of the truth of McLane's affidavit for continuance, nor to the reading of said affidavit as evidence. He is not, therefore, in a position to complain. The defendant, McLane, can not take advantage of any error that was solely prejudicial to the defendant, McIntire.

It may be that, by the admission, the defendant, McIntire,

was deprived of the full force of the instructions given to the jury, to the effect that it was their duty to weigh and consider the testimony of each defendant fairly and impartially, and give to each the benefit of it so far as it appeared to be credible. This only furnishes an additional reason why the defendant, McIntire, would have been entitled to a new trial if he had made his objections in the lower court at the proper time. It has no force whatever as applied to the case of the defendant, McLane. There is nothing in the admission made by the state, nor in the instructions, that deprived the defendant, McLane, of any benefit that he was entitled to.

The admission was made in such a manner as required the jury, " in all their deliberations," to consider the facts set forth in McLane's affidavit as " established beyond all controversy." It is a self-evident proposition that it might have prejudiced the defendant, McIntire, but it could not possibly have prejudiced the defendant, McLane. If either of the defendants is entitled to a new trial, upon this ground, it is the defendant, McIntire, not McLane.

From the state of the facts as elicited at the trial, it clearly appears that the defendants were entitled to a separate trial, if a sufficient showing had been made, and a severance asked for at the proper time.

It is, however, well settled, that if a defendant fails to make a motion or an objection, when required by the rules of practice or the principles of the law, he can not thereafter take any advantage of his own omission of duty in that respect.

In my opinion, the action of the court in refusing to grant the defendant, McLane, a separate trial, is sustainable, upon the ground that the motion was made too late. The motion should have been made before the court commenced to impanel the jury.

I concur in the conclusions reached by the court upon all of the other points.

It necessarily follows from the views I have expressed, that, in my opinion, the judgment of the district court should be affirmed against both defendants.